Filed 2/26/14  P. v. Bowman CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES BOWMAN<br><br>    Defendant and Appellant. | B242467<br><br>(Los Angeles County<br>Super. Ct. No. LA054006) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Speer, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

James Bowman appeals the judgment entered following a trial in which the jury found him guilty of first degree willful, deliberate and premeditated murder with a finding he personally and intentionally discharged a firearm proximately causing death. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1] At sentencing, the trial court imposed an aggregate term of 50 years to life, consisting of a base term of 25 years to life, enhanced by a consecutive term of 25 years to life for the personal discharge of a firearm causing death.

At the close of the evidence, the trial court instructed the jury on first degree deliberate and premeditated murder, second degree murder and voluntary manslaughter. The jury convicted appellant of first degree murder.

## BACKGROUND

1. *The prosecution case.*

a. *The homicide.*

In 2006, the deceased, Shirley Jackson (Shirley), age 47, lived alone in a North Hollywood residence. Shirley was an alcoholic who daily drank about a quart and a half of brandy. In July 2006, she was arrested for an incident of domestic abuse with her then live-in boyfriend, Paul "Shotgun" Corralejo (Shotgun). Shortly thereafter in July, Shotgun, a heroin user and alcoholic, moved out and started living in a park.

Appellant, James Bowman, was a friend of Shirley's. They had met 15 years earlier when Shirley was married to appellant's friend, Tommy Villigrand (Tommy). Shirley was kind-hearted. Appellant was living in a camper. For the preceding two years, she had let appellant live in his camper in front of her residence.

---

[1]	All further references to a code section are to the Penal Code unless otherwise indicated.

During the morning hours of November 7, 2006, Shirley's best friend, Shotgun's sister, Roxanne "Mouse" Corralejo (Mouse), became concerned when she was unable to reach Shirley on her cellular telephone. Mouse drove to Shirley's residence. No one answered the door. Shirley's car was missing from the driveway. Appellant's camper was no longer parked out front, and appellant was not there. Mouse telephoned 9-1-1.

Los Angeles police officers responded. A police officer found Shirley inside one bedroom of the house. She was dead. At trial, a Los Angeles County deputy coroner testified the cause of death was a through-and-through gunshot wound to the back of the head. Shirley had seven broken ribs, and there were contusions and abrasions all over her body. The deputy coroner opined she had been beaten so severely that if she had not been shot, she may well have died from the beating.

Shirley weighed 107 pounds at death and had a blood alcohol level of 0.26. She was about five feet tall.

The police found a nine-millimeter handgun concealed in a plastic bag on the porch at the side door Shirley used to enter her residence.

On November 7, 2006, appellant turned himself in at the county jail. He claimed he had shot someone.

b. *Mouse's testimony.*

Mouse testified she and Shirley were like sisters. They visited daily and talked by telephone several times a day. According to Mouse, appellant and Shirley had no romantic relationship. Shirley told Mouse she never let appellant enter her house, and Mouse never saw appellant inside the house. After Shotgun moved out, Shirley informed Mouse that appellant had been trying to "get closer to" her. Appellant was always hanging around, asking her dumb questions and looking in her windows to see what she was doing. She had been trying to "brush him off" in a nice way, but it was not working.

During the week prior to her death, Shirley complained appellant kept coming over and "bugging her." She told Mouse she felt smothered. Appellant kept getting

3

"creepier," and Shirley was in tears all the time as he was bothering her. Shirley said she wished Shotgun would return because appellant was scaring her.

Mouse helped Shirley purchase new curtains for privacy and visited Shirley more frequently. Shirley was often too intoxicated to drive so Mouse drove Shirley for shopping and elsewhere to get her out of the house. Twice during the week prior to the shooting, Mouse drove Shirley to a hotel where she spent the night.

At 3:00 p.m. on November 6, 2006, Mouse told Shirley by telephone Shotgun was in the hospital after a seizure. Over the telephone, Shirley sounded as if she were drunk. Shirley told Mouse she wanted to go to the hospital and bring Shotgun home. During the conversation, Shirley whispered that appellant was standing by her door eavesdropping on their telephone conversation.

Mouse told Shirley that when she returned from picking up her son, she would call again to finish their conversation. Perhaps then, Mouse could drive Shirley to pick up Shotgun. Mouse telephoned Shirley again at 4:00 p.m. but could not reach her. Mouse telephoned appellant. Appellant said Shirley was at the store. Mouse and appellant talked for 45 minutes.

During the conversation, appellant asked Mouse, "She's not bringing Shotgun back here, is she?" When Mouse said it was none of his business, appellant told Mouse, "She needs to be with me because I love her." He threatened, "She better not bring that son of a bitch back here." Mouse tried to instill a little reality into the situation. Mouse told appellant Shirley was not interested in him romantically and just "felt bad for" him. Appellant got angry and said, "You know what, she needs to go forward and not backwards. She needs to be with me because I love her." Mouse told him he was " 'smothering [Shirley], and you need to leave her alone.' " She commented that Shirley was ready to tell him to move his camper out of its spot. Hearing what Mouse had to say made appellant angry.

Mouse was impeached with her 1981 prior convictions of voluntary manslaughter, assault with a deadly weapon and assault with the intent to commit murder. Mouse acknowledged appellant might have mentioned to her that Shirley was telling Mouse one thing and turning around and saying something entirely different to appellant. Mouse admitted her bias -- she wanted Shotgun and Shirley to live together again.

   c. *Appellant's statement to the police.*

   On November 8, 2006, two North Hollywood homicide officers interviewed appellant. After a *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436), appellant made a tape recorded statement in which he admitted that after a fight, he had shot Shirley twice in the back of the head.

   Appellant explained that before Shotgun moved out in July and after Shirley was released from jail, Shirley was spending "half . . . most of the time every night in the camper with me." He said, "[E]ventually, [this] turns into a sexual relationship sort of." He indicated the sexual relationship had been going on for only a short time. He complained, later, Shirley told him she had been coming to his camper only because she was afraid of Shotgun. Shirley also disappointed him by having sex a little over a week before the shooting with his best friend, Bob Lawrence (Bob). He told the officers that Shirley "is not my girlfriend."

   He asserted during the week before the shooting, things had been tense with Shirley. On Tuesday, Halloween, Shirley would not speak to him. When she left her residence with Mouse, he asked her where she was going. She replied, "Let me go. Let me go. Let me go." That week, Shirley spoke about her regrets concerning her former husband, Robert, who was in prison. It upset appellant to hear her talking about another man as "to this day [he had] never spent one whole night in her house." He told the interviewing officers he gave Shirley "all her space," and she was complaining about feeling smothered. Appellant stayed outside most of the time, and he told her that unless he was invited, he would not "even come [out]." When they spoke on Wednesday

evening, she talked on and on about Shotgun. He complained again he was the one who was taking care of Shirley day in and day out.

On Sunday, November 5, 2006, Mouse did not visit, and Shirley got lonesome, so they hung out on the lawn talking. He observed that afternoon, "everything seemed real good." When it got dark and he returned to his camper, she telephoned him and told him jokes.

On Monday morning, November 6, 2006, he went to the West Valley Mental Health Clinic to see his therapist, Chris Collins (Collins). He told her that he was upset and why -- he told her the same tale he was telling the officers. He wanted more psychotropic medication. He told Collins he felt "shaky," and if he couldn't "chill out," he did not know what would happen. He said, "I can kill myself or somebody else." Collins obtained the additional medication he requested. At 1:30 p.m. he returned home. Shirley got him a glass of ice for some water. They hung out on the lawn and were getting along just fine.

But as it got dark, Shirley got into her car in order to drive off. He walked over and asked if she were going to the local liquor store. He gave her money for iced tea, a soda, or a "little margarita." Although the liquor store was just around the corner, she did not return for hours. He telephoned Mouse. Mouse told appellant she did not know where Shirley was, but speculated if Shirley were missing, she was looking for Shotgun or renting a hotel room for him. This upset appellant. He did not understand why Shirley would reconcile with Shotgun after she had had such a bad time with him.

Shirley returned home some three hours later. Appellant approached her on her driveway and asked whether she had his drink. Appellant claimed Shirley was drunk, belligerent and verbally abusive. She snapped at him, "You f----- go get it."

They argued and had a physical altercation. He did not indicate how they got into the house where the fight occurred. He claimed his recollection of the fight was "blurry." He could not remember the details of the "melee" and denied he had beaten Shirley. He admitted during the physical altercation, he had removed a nine-millimeter handgun

6

he had given her from under her sofa cushions in the living room. After 5 to 10 minutes of fighting, she fell to the ground, and he shot her twice in the back of the head.

During the fight, appellant claimed he had gone into a "blackout zone." He had shot Shirley in the "heat of the moment"; it was "[p]ossibly a crime of passion." He claimed he had retrieved the gun from the sofa and put it in his belt because he did not know what Shirley was going to do; she had such a temper. He denied thinking about killing her prior to the shooting.

He said what had "p----- [him] off" was the incident with Bob. Bob and Shirley were his two best friends, and they had stabbed him in the back when they had sex when they knew what it would do to him. He complained again that as close as he and Shirley had been, he had never even spent the night at her place. He explained that after the incident with Bob, he forgave Shirley. He said, "[W]e've survived so many guys in her life." Shirley even had sex with his son for a while. Appellant was still upset at his son and with Shirley about that. He and Shirley had not had sex since the Sunday afternoon nine days previously, the same day Bob later spent the night with Shirley.

After the shooting, appellant made preparations to turn himself in. He purchased gasoline for his camper. He wanted his son to sell the camper so he would have a little money. He obtained the remainder of his general relief money. He gave his dog to a friend, Kendra Kenney (Kendra). He claimed he spent the night sitting in a chair in Shirley's residence sleeping. The next morning, he drove his camper to Kendra's, went out to breakfast, got a haircut and turned himself in. He telephoned Kendra and told her he had shot someone.

He reiterated the killing was "unintentional" or "accident[al]." It was maybe "over reaction." He had mental health issues and had "just snapped." He complained "none of this would have ever happened if that f---- Bob hadn't did what he did."

Appellant inquired of the officers what he was being charged with. The officer replied, "Murder." Appellant asked, "Which one? [¶] . . . [¶] . . . Murder one? Murder two?" The officer replied, "Just murder." Appellant asked, "Not manslaughter?"

7

d. *Kendra's testimony.*

Recently, after not seeing her for some time, appellant contacted Kendra,. Appellant purportedly wanted his dog's papers, and they visited. He told Kendra that he and Shirley had "gotten together." He said he felt he was "smothering" Shirley, and she might be going back to her former boyfriend, Shotgun.

About 8:00 p.m. on Monday, November 6, 2006, appellant drove to Kendra's residence in Shirley's car. He had Kendra drive him to Shirley's so he could move his camper to Kendra's. He slept overnight in his camper outside her residence. The next morning, he drove off in Shirley's car, depositing a number of items into a box in her garage.

When appellant informed Kendra he had shot someone, she telephoned the police. She gave them the box appellant left in her garage. It contained a disassembled shotgun, a .357 revolver and ammunition for both guns.

2. *The defense case.*

Appellant testified on his own behalf.

Appellant claimed that in July 2006, after Shirley was arrested and returned home, Shotgun was still living in her residence. Temporarily, Shirley stayed with appellant in his camper. Appellant said they hung out together all day, and they slept in the camper. He drove her to all of her appointments. He asserted they had been inseparable. When Shotgun finally moved all his belongings out on October 2, 2006, he and Shirley started hanging out in the house all the time. When they spent a night in the house, generally he would leave at 3:00 or 4:00 a.m. and return to the camper.

Things were good, and they talked about how happy they were now that they were together. Then the incident with Bob occurred on Sunday, October 27, 2006. The next day, Shirley told him Bob had gotten her drunk and nagged and nagged her for sex, and she finally agreed. Appellant forgave her, but had trouble forgetting it. On Wednesday, Mouse visited, and appellant saw the women lying on the bed in Shirley's bedroom fully clothed. On Friday, the cable man came to install cable television. Appellant suspected

8

Shirley had sex on these two occasions with Mouse and the cable man. In addition, that week following the incident with Bob, Shirley had stopped spending as much time with him.

This had upset appellant. He stopped being sober and began taking too much psychotropic medication and drinking alcoholic beverages.

On Sunday, November 5, 2006, Mouse did not visit Shirley, and things seemed to return to normal; he and Shirley had a "good day." He saw Collins on Monday morning, November 6, 2006, and returned home. He purchased a bottle of premixed Margarita drink. He and Shirley did some drinking together on the lawn. Just before dark, Shirley said she was going to the store. She took money from him to purchase something for them to drink and drove off. Shirley did not return immediately.

After several hours, Mouse telephoned and told appellant Shirley was up on Lankershim in a hotel with Shotgun. This further upset him. When Shirley drove into her driveway, he asked her, "Did you get us our drinks?" She was drunker than usual and angrily told him, "Go get your own f----- drink." He asked whether she had been with Shotgun. She replied, "So what if I was." Then the telephone rang, and appellant could hear her former husband Robert, who was telephoning from state prison, leaving a message on Shirley's answering machine.

They argued about Shotgun. Shirley walked into the bedroom to take her shoes off. He did not know whether Shotgun would be showing up to hurt him, so he retrieved the handgun he earlier had given to Shirley from her sofa. He put it in his belt. When she walked out of the bedroom, she was "physically abusive." She got hold of his finger and dislocated it in two places. He was emotionally and physically in pain. There was a "big fight," and he ended up pulling out the handgun and shooting Shirley in the hallway. He did not plan to do that. He claimed he "wasn't thinking," and that he was "[in]capable of thinking at that point."

During cross-examination, appellant claimed he "loved" Shirley when he shot her. He agreed Shirley was kind, but she could be "nasty" when drunk. He explained that

after July of that year, he and Shirley "pretty much had an understanding that [they] would be true and faithful to one another." When Shirley told him he was "smothering" her, he concluded those were Mouse's words, not Shirley's.

The deputy district attorney questioned appellant regarding whether he had a right to ask for fidelity from Shirley during their "sexual relationship." Appellant said he wanted to "recant" the statement he had made to police insofar as he had claimed Shirley was not his girlfriend. He was now asserting Shirley was his girlfriend. The deputy district attorney asked appellant whether he was talking about Shirley when appellant told his therapist Collins he might "kill [himself] or somebody else." Appellant replied he was probably thinking of Bob, not Shirley. Later in his testimony, appellant denied ever making such a statement to Collins.

Appellant said all he could recall about the fight now was that he and Shirley both hit the ground three times and there was a lot of screaming and yelling, banging around against the walls and floors and stumbling and tripping. He admitted he was six feet two inches tall and weighed about 190 pounds and had military experience. He denied he had ever hit or kicked Shirley. He said, "[I]t was a very big state of confusion and a very big fight and a melee going on where I was under a great mental . . . anguish at that time." Shirley had taken hold of his finger and broke it, and he was "in extreme pain." He "was only reacting to the emotional pain and physical pain that [he] was feeling at that exact moment."

Then he said they were "tangled up a bunch of times and [there was] a lot of banging into the walls, falling to the floor." He claimed he shot Shirley because he was in physical and emotional pain "from all the things that had happened to him that week." He had been incapable of thinking of anything or making a wise decision. He had been drinking all week and was full of prescription medication. The shooting was unplanned.

Appellant made additional claims that the biological matter the police found on the hand gun was planted by the police and that Mouse probably hid the gun the officers recovered as appellant had left it on a table on Shirley's porch in open view. His only

10

explanation for the severity of Shirley's injuries was that if she actually had been with Shotgun in a hotel room, Shotgun probably had hit her before she returned home. He disputed Kendra's claim he slept overnight on Monday night in his camper out in front of her residence; he insisted he moved the camper only on the following morning.

## CONTENTIONS

Appellant contends the trial court erred and denied him his constitutional right to present a defense by applying *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) to the PET scan results (positron emission tomography), and on the same grounds, excluding from evidence the related expert medical testimony from a neurologist, Dr. Arthur Kowell (Dr. Kowell).[2]  He also contends the trial court abused its discretion and rendered the trial fundamentally unfair when it failed to give or to modify a jury instruction submitted as a discovery sanction.

## DISCUSSION

1. *The PET scan results and Dr. Kowell's testimony.*

Dr. Kowell had administered CT, MRI and PET scans to appellant and examined appellant personally prior to trial. At trial, the trial court ruled the PET scan results and Dr. Kowell's testimony concerning the PET scan results and his opinion concerning the results of his related examination of appellant were inadmissible on *Kelly* grounds. On appeal, appellant complains, if the doctor had been permitted to testify, he would have opined appellant's behavior during the shooting was "consistent with that of someone suffering from hypometabolism" in the temporal lobes, or with a decreased functioning of those lobes, and the condition would affect whether a person actually deliberated or

---

[2]  *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, was the federal counterpart to *Kelly*.  (*Kelly*, *supra*, 17 Cal.3d 24.)  The United States Supreme Court overruled *Frye* in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, holding the Federal Rules of Evidence abrogated *Frye*.  However, the California Supreme Court held *Kelly* survives *Daubert* in California.  (*People v. Leahy* (1994) 8 Cal.4th 587, 604 (*Leahy*).)  The *Kelly-Frye* test is now referred to as the *Kelly* test or rule.  (*People v. Bolden* (2002) 29 Cal.4th 515, 545.)

11

premeditated as "it is associated with impulse control disorder."[3] The doctor's testimony was expert medical opinion testimony which properly should have been admitted into evidence.

   a. *Dr. Kowell's Evidence Code section 402 testimony.*

   Prior to trial, in a written motion, the deputy district attorney raised objections to the doctor's testimony on grounds of *Kelly*, *supra*, 17 Cal.3d 24. He argued the PET scan results are not generally accepted in the scientific medical community as disclosing anything about the elements of malice aforethought, including express malice (intent to kill), and deliberation and premeditation. Dr. Kowell's opinion was largely dependent on the PET scan results, and for that reason, it should be excluded. Insofar as Dr. Kowell's opinion was dependent on appellant's social and medical history, Dr. Kowell, a neurologist, was not qualified to testify as would a psychologist or psychiatrist as it was "out of his purview." The deputy district attorney urged the neurological opinion was irrelevant, or more prejudicial than probative, because the science does not permit anyone to draw a conclusion based on the PET scan or to know whether there was a biological sign five years previously when the shooting occurred that indicated an impulse control disorder.

---

[3]   The offer of proof at the hearing was Dr. Kowell would testify the results of the PET scan "in combination with [the doctor's] examination [of appellant] are consistent." The PET scan showed hypometabolism in the bilateral temporal lobes of the brain. The hypometabolism is "consistent with someone who exhibits poor impulse control." Trial counsel doubted whether Dr. Kowell would be discussing a specific diagnosis based on those results. In addition, the doctor would opine, based on a hypothetical loosely based on appellant's claims in defense, that appellant's conduct at the time of the shooting is "consistent with someone who suffers from hypometabolism in the temporal lobe, or that that behavior is consistent with . . . decreased functioning in temporal lobes." The doctor would also provide information to the jury about the function of the temporal lobes as it regulates impulse control. He would opine individuals who have a deficiency in impulse control do not necessarily deliberate or think before acting on those impulses. Trial counsel claimed the issue of impulse control was relevant to the mental states of malice aforethought (intent to kill) and deliberation and premeditation.

The parties agreed Dr. Kowell was an experienced neurologist who frequently used PET scans. They agreed the PET scan was taken almost five years after the shooting through no fault of appellant or his trial counsel.

Dr. Kowell testified at the hearing. He said there were no abnormalities on the CT and MRI scans he ordered for appellant. (An MRI scan reveals structural abnormalities in the brain.) However, the PET scan demonstrated at the time of the scan, the nerve cells in the temporal lobes were less active than they should have been, which is an abnormality according to the study. The significance of the abnormality, however, had to be interpreted in light of other facts. A doctor cannot determine from a PET scan how long the abnormality has existed. He cannot tell the pathology responsible for the decrease in metabolism. A patient's history is then referenced to suggest "possibilities" for the decreased activity. Dr. Kowell could not say with any certainty what the cause of the abnormality was. But based on appellant's history, as appellant relates it, and the collateral documents provided to him, Dr. Kowell believed the causal factors for the decreased functioning probably were "chronic alcohol and/or marijuana abuse and/or cerebral trauma."

The doctor said the temporal lobes have a number of functions, one being it is "important in terms of impulse control." He claimed "a number of studies" indicate persons with hypometabolism have impaired impulse control. The "exact nature of this in terms of [brain] circuitry in the temporal lobe is not entirely well worked out." There is some relationship according to the studies, but to be fair, there are patients who have the decreased brain activity who do not have impaired impulse control. Dr. Kowell explained the scan tells you there is decreased activity; it does not indicate the cause of the decreased activity. The clinician must look to a patient's history to discern a cause for the condition. For appellant, Dr. Kowell opined a possible cause for the hypometabolism observed on the scan "would include chronic and/or marijuana abuse and cerebral trauma." He said, "I think that the hypometabolism would be consistent with his previous history as documented in the records of impulse control problems."

13

Trial counsel addressed Dr. Kowell with a hypothetical loosely based on appellant's postarrest statement to the police and his anticipated testimonial claims. She asked whether the shooting was a "type of behavior consistent with someone who suffers from hypometabolism in the temporal lobes?" Dr. Kowell replied, "It would be consistent with someone who has temporal lobe dysfunction of which hypometabolism provides at least a biological sign that there is a malfunction or dysfunction in the temporal lobe. [¶] In other words, hypometabolism itself doesn't mean he's going to pull out the gun and shoot someone, but hypometabolism indicates that there is a temporal lobe problem for which this patient may be at greater risk for a . . . impulsive behavior." Trial counsel asked whether given the "set of stressors" described in her hypothetical, would a person react in a more "violent fashion than someone without the hypometabolism?" Dr. Kowell, said, "In a statistical sense, yes."

Trial counsel asked whether a person with hypometabolism would necessarily take time to consider his actions beforehand? The doctor said, "Such a person would be at greater risk for not contemplating the consequences of their actions." He explained there is a condition causing the hypometabolism, and there could be several of them. It is that condition which results in the dysfunction seen on the scan, not the scan results, that creates the greater risk of a person not contemplating the consequences of their actions. Such a person with that condition would "react first and think later." The doctor agreed he could not say "definitively" that appellant had a "temporal lobe condition."

The doctor testified the PET scan itself produces reliable scan results. It is the interpretation of the abnormality disclosed by the test that presents problems not only in medicine but in a forensic context. "In other words, what does the abnormality mean." In appellant's case, the doctor had concluded likely candidates causing such an abnormality would be "chronic alcohol and/or marijuana abuse and cerebral trauma."

During the hearing, Dr. Kowell said he could not say to a high degree of certainty or probability that persons with the abnormality he saw on the PET scan have impulse control disorder. He could not diagnose a lack of impulse control or an impulse control

14

disorder. The most he could say was that temporal lobe dysfunction is consistent with patients who have impulse control disorders. To be fair, however, the doctor pointed out that someone with hypometabolism may not have decreased impulse control, and a person with impulse control disorder may not have hypometabolism. The significance of the hypometabolism is unknown.

Dr. Kowell could not say what the condition of appellant's brain had been five years previously, much less the day before or the day after the scan. Such conditions as lack of sleep, depression, the taking of psychotropic medications, mood, brain activity taking place during the scan and other conditions could affect the level of the activity. Dr. Kowell could not quantify how the many variables might affect the scan nor could he control for them. The doctor acknowledged appellant was taking medication when the scan was taken. Also, appellant's circumstances -- he was incarcerated and facing serious criminal charges -- could cause depression.

The deputy district attorney pointed out that Dr. Susie Bash, the radiologist, said in her report the abnormality was "modest" and "[t]he significance of the temporal lobe hypometabolism is unknown at this point in time. Theoretically, the earliest beginning findings of a neuro dementia syndrome could potentially be present. . . ." Dr. Kowell agreed with Dr. Bash's observation -- the hypometabolism might merely indicate appellant had developed dementia which was of recent origin.

The deputy district attorney asked whether Dr. Kowell was familiar with *The Judge's Guide to Neuroscience, a Concise Introduction*, published in 2010 by Dr. Helen Mayberg. The doctor replied he was unaware of the publication, but aware of Dr. Mayberg, a specialist in nuclear medicine. The deputy district attorney read to Dr. Kowell from that publication: " 'It is beyond the data generated from any currently published scanning protocol to make predictions about the rational capacity or lack thereof of a criminal defendant or to make inferences as to that defendant's intent at a specific moment in time before or during a specific criminal act. Time will tell if paradigms can be designed that meet the necessary criteria to make such inferences.' "

15

Dr. Kowell testified he agreed with Dr. Mayberg's claim -- based on the results of the scan a doctor cannot state with certainty what a person's intent may have been at a specific moment in time during or before a specific criminal act as far as intent goes. The doctor clarified that the PET scan results can only be considered in combination with other information. He claimed where there is a biological basis for the patient's behavior, the PET scan can help reach a conclusion. By itself, the scan results cannot be used for a diagnosis.

The doctor acknowledged he knew of no literature indicating there was general acceptance in the medical scientific community of the use of PET scans to draw inferences about the "intent to do anything." He said he did not know whether there is a general consensus in the medical scientific community that a person with a modestly low metabolic problem, as disclosed by a PET scan, can be diagnosed as having poor impulse control. Nevertheless, Dr. Kowell said in his experience, the PET scan results were reliable in disclosing metabolic activity and in diagnosing conditions such as epilepsy, stroke and dementia. And, in his opinion, the scan results raise "a red flag" that there is a biological dysfunction, making it more likely the patient has an impulse control disorder.

In questioning about the issue of controlling variables, Dr. Kowell said, "[U]sually you would not get this type of an abnormality. . . unless there was something . . . that was there, and you would not suspect it would be affected by [the variables] you raise[]."

In his written motion, the deputy district attorney provided the trial court with a list of articles and publications that supported his argument brain imaging is too speculative to be used forensically to determine mental states in the guilt phase of a trial.[4] He also provided the trial court with citations to two federal cases in which SPECT

---

[4] Those articles and publications apparently were not attached to the deputy district attorney's motion to exclude and thus are not included in the appellate record.

(single photon emission computed tomography) or PET scans were deemed unreliable with respect to drawing inferences concerning mental states in a criminal case.

During argument on his objections to the testimony, the deputy district attorney asked the trial court to rule on his Evidence Code 352 objection, as well as on the *Kelly* issue.

b. *The trial court's ruling.*

The trial court commented it is undisputed that Dr. Kowell is an expert in neurology and in interpreting PET scans, that appellant had an abnormal PET scan revealing hypometabolism in his temporal lobes, and that the PET scan was performed correctly. The trial court concluded from the testimony that PET scans are legitimate tools for diagnosing medical disorders of the brain, particularly with regard to dementia, stroke and epilepsy.

The trial court said the issue raised is the reliability of the PET scan for use forensically in this case. It set out a number of problems with Dr. Kowell's testimony. The doctor could not date the onset of the abnormality nor the cause of the abnormality, and he cannot eliminate other contributing factors such as dementia, medication, depression, lack of sleep, etc. Nor can he predict whether the findings would be the same even one day before, or after, October 26, 2011, when the PET scan was taken. There are so many variables that affect the hypometabolism of the temporal lobes that the results can be almost transient depending on the variables.

Dr. Kowell could only interpret the results of the scan with the use of appellant's social, psychological, and medical history, taking that history from appellant and the other documents he was given to review.

What was most troubling is that even if a person has this abnormality in the temporal lobes, he might have reduced impulse control, but not necessarily. There is no consistent correlation between the PET scan finding and reduced impulse control. The PET scan is not a definitive test and not necessarily a predictor of behavior. There is no statistical correlation between abnormal PET scan results and the lack of impulse control.

17

The doctor admitted there is no consensus in the medical scientific community that the interpretation of the PET scan results necessarily predicts reduced impulse control.

The trial court noted the radiologist, Dr. Susie Bash, said the following. " 'The significance of the temporal lobe hypometabolism is unknown at this point in time. Theoretically, the earliest beginning findings of a neuro dementia syndrome could potentially present like this; however, no formal neuro dementia diagnosis can be established on this initial examination, particularly since metabolism is within normal limits remote to the temporal lobes at this point in time.' "

There was no evidence of structural brain changes on the CT images or on the MRI. There was no suggestion of cerebral atrophy. No other tests document or corroborate that appellant has some type of brain malfunction or structural disorder that can more strongly be correlated to his behavior; that is, reduced impulse control.

The trial court further observed to conclude appellant had a loss of impulse control or an impulse control disorder is speculation. It is similar to saying a brain tumor one has today is responsible for a homicide five years previously. The defendant cannot prove the tumor existed five years previously, or that a brain tumor always results in homicidal behavior. Even if the PET scan had been taken immediately after the shooting, the same PET scan results would have been meaningless in terms of assisting appellant's defense.

The speculative nature of the abnormality here is the same. The opinion is not reliable in a forensic context, and the doctor seems to admit it.

The trial court found the foundation inadequate to comply with *Kelly*. If *Kelly* did not compel the exclusion, then the doctor's testimony and PET scan results should be excluded pursuant to Evidence Code section 352. The speculative nature of the results and the doctor's opinion would serve only to confuse the jury. The risk of possible confusion outweighs the probity of the testimony.

The trial court said it would not permit Dr. Kowell to testify "at least with regards to what he testified to here today." The trial court asked whether the parties wished to make any further record. Neither of the parties responded.

18

c. *The analysis.*

In *Kelly*, *supra*, 17 Cal.3d 24, the court held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. (*Id.* at p. 30.) The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. (*Ibid.*) The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*Ibid.*) Here, we are concerned only with the first prong of the *Kelly* test.

Appellant argues the trial court improperly applied the *Kelly* rule to evaluate the admissibility of Dr. Kowell's testimony. He asserts the PET scan results were reliable for detecting brain dysfunction and were a proper basis for Dr. Kowell's opinion of possible brain dysfunction. As such, Dr. Kowell's testimony was mere expert medical opinion based on inductive reasoning from his personal experience, observation and peer-reviewed literature that does not fall within *Kelly*. He also disputes the trial court's Evidence Code section 352 ruling.

The trial court's ruling on the admissibility of Dr. Kowell's opinion as a relevant medical opinion and with respect to Evidence Code section 352 are reviewed for an abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 266.) The conclusion that a certain legal principle, like the *Kelly* rule, is applicable or not in a certain factual situation is examined independently. (*Rowland*, at p. 266.)

At the threshold, we reject the People's claim appellant never argued the proffered evidence did not constitute a new scientific technique to which *Kelly* applied. Although no one at the hearing specifically addressed the issue of *Kelly*'s application with this specific language, implicit in the deputy district attorney's argument was that very point. There was no forfeiture.

The rule in *Kelly* applies to a limited class of expert testimony based in whole or in part on a technique, process, or theory which is new to science, and even more so to the

19

law.  (*Leahy, supra,* 8 Cal.4th at p. 605.)  Under *Kelly*, "the admissibility of evidence obtained by use of a scientific technique does not depend upon proof to the satisfaction of a court that the technique is scientifically reliable or valid.  [Citation.]  Because courts are ill suited to make such determinations, admissibility depends upon whether the technique is generally accepted as reliable in the relevant scientific community." (*People v. Bolden*, *supra*, 29 Cal.4th at p. 546.)

In his written motion objecting to the use of Dr. Kowell's testimony, the deputy district attorney listed a number of articles and publications indicating there is no consensus in the medical community as to whether the results of brain imaging tests are probative on the issue of drawing inferences concerning mental states in criminal cases. During the hearing, the deputy district attorney referred to Dr. Helen Mayberg's 2010 article in *The Judge's Guide to Neuroscience, a Concise Introduction*, which concluded a physician could not predict from any scanning protocol the rational capacity or lack thereof of a criminal defendant or draw inferences as to a defendant's intent at a specific moment in time before or during a criminal act.[5]  Dr. Kowell could not testify there was general agreement in the medical scientific community that someone with a modestly low

---

[5]     He also cited two federal cases, *Jackson v. Caldron* (9th Cir. 2000) 211 F.3d 1148 (*Jackson*) and *Yum v. Carey*, case No. EDCV 05-1082-CAS (MAN), a petition for habeas corpus dismissed on September 30, 2009, in the United States District Court for the Central District of California (2009 U.S.Dist. Lexis 120284), later adopted by *Yum v. Carey* (C.D.Cal. Dec. 18, 2009) 2009 U.S. Dist. Lexis 120318 (*Yum*).  The *Jackson* case involved a petition for habeas corpus in which the petitioner challenged his California murder conviction and death sentence.  Petitioner made a claim of factual innocence based in part on a claim his PET scan results showed he was unable to premeditate or form specific intent.  In rejecting the claim of innocence, the court mentions at trial the prosecution's expert testified the use of PET scans to diagnose chronic PCP abuse is not generally accepted by the scientific community.  It also observed the trial testimony of the prosecution's expert was not refuted.  (*Jackson*, at p. 1165.)  In *Yum*, the trial court excluded the results of a SPECT scan on the defendant-petitioner had failed to prove the procedure had achieved general acceptance in the pertinent scientific community for use in showing PTSD, ADD, or violent behavior.  (*Yum*, 2009 U.S. Dist. Lexis 120284 at p. 51.)

metabolic problem, as disclosed by the PET scan, can be diagnosed as having poor impulse control.  Nor could the doctor testify that science had advanced and the conclusions of the authorities no longer reflected the consensus of the medical community.

We acknowledge the medical scientific community may agree a PET scan is generally accepted for diagnosing tumors, epilepsy and dementia.  However, the burden was on appellant as the proponent of the doctor's testimony, to show the *Kelly* test had been met.  The evidence at the hearing was unequivocal in establishing the medical scientific community does *not* yet accept that PET scan results can provide information to the expert in a criminal case that may assist the jury in determining a defendant's mental state.

d.  *Conclusion.*

After reviewing the relevant case law, we conclude the trial court properly applied the rationale in *Kelly* to exclude the results of the PET scan.  Dr. Kowell's testimony made it appear the PET scan results were the cornerstone of the doctor's opinion with respect to whether appellant could be suffering a mental defect or brain dysfunction that affected his impulse control.  Dr. Kowell's opinion belonged to "that limited class of expert testimony" which was "based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law."  (*Leahy*, *supra*, 8 Cal.4th at p. 605, citing *People v. Stoll* (1989) 49 Cal.3d 1136, 1156; see also, *Roberti v. Andy's Termite & Pest Control* (2003) 113 Cal.App.4th 893, 900; *People v. Mitchell* (2003) 110 Cal.App.4th 772, 782.)

The PET scan as used here is " scientific" as the " 'unproven technique or procedure appears *in both name and description* to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' "  (*Leahy*, *supra*, 8 Cal.4th at p. 606.)  It is different from mere medical opinion, which jurors can temper with healthy skepticism "born of their knowledge all human beings are fallible."  (*People v. McDonald* (1984) 37 Cal.3d 351, 372 (*McDonald*).)  Dr. Kowell's opinion of possible

21

brain dysfunction in large part was based on the results of a machine and its accompanying computer analysis. As lay persons, the jury may well have "ascribe[d] an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure[, when] aura of infallibility that often surrounds such evidence may well conceal the fact that [the methodology] remains experimental and tentative." *(Id.* at pp. 372-373, overruled on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.)

e. *Expert medical opinion testimony and Evidence Code section 352.*

At the hearing, appellant proffered Dr. Kowell's opinion and argued it was admissible as a garden-variety expert medical opinion relevant to the issue of deliberation and premeditation.

Appellant relies on the following rule: "California distinguishes between expert medical opinion and scientific evidence; the former is not subject to the special admissibility rule of [*Kelly*]." (*People v. Ward* (1999) 71 Cal.App.4th 368, 373 citing *McDonald*, *supra*, 37 Cal.3d. at pp. 372-373.) "An expert may always give his opinion as to the cause of a particular injury or condition, and lack of absolute scientific certainty does not constitute a basis for excluding the opinion." (*People v. Cegers* (1992) 7 Cal.App.4th 988, 998 (*Cegers*), quoting *People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1293-1294; see also *People v. Phillips* (1981) 122 Cal.App.3d 69, 86.)

However, this legal proposition does not control here. The trial court gave appellant the opportunity to present Dr. Kowell's testimony in its entirety at the hearing to permit the trial court to rule on admissibility. Trial counsel made no effort at the hearing to divorce the PET scan results from Dr. Kowell's medical evaluation of appellant. The evidence at the hearing was susceptible of only the conclusion: the PET scan results were an integral part of the doctor's conclusions as to appellant. Thus, once the trial court determined *Kelly* applied, there was no need to proceed on with a relevancy or Evidence Code section 352 ruling. Under California law, if there is a new scientific procedure or methodology at issue, the reliability of the results of the procedure or

22

methodology are determined by the test in *Kelly*, not by the more general rules of relevancy and Evidence Code section 352. (*Leahy, supra*, 8 Cal.4th at pp. 594-604.)

Furthermore, even if the trial court erred by failing to properly apply the *McDonald* and *Cegers* rule, Dr. Kowell's opinion is still subject to the rules relating to relevancy and Evidence Code section 352. The doctor could not diagnose a mental disease or defect that would be relevant pursuant to section 28 and 29.[6] The radiologist, Dr. Susie Bash, indicated the PET scan results were within normal limits and might only indicate the presence of the onset of dementia. No one could know whether the scan results could be replicated from day to day, much less five years earlier at or near the time of the shooting. The trial court concluded the doctor's opinion was simply too speculative to be admissible, and the potential for jury exclusion outweighed any minimal relevancy.

" 'In California evidence is relevant only if it has "any tendency in reason to prove or disprove any disputed fact" (Evid. Code, § 210). And an expert's testimony must be based on matter "that is of a type that reasonably may be relied upon by an expert" (*id.*, § 801, subd. (b)). (See *Leahy*, *supra*, 8 Cal.4th at pp. 597-598.)' [Citation.]" (*Roberti v. Andy's Termite & Pest Control, Inc.*, *supra*, 113 Cal.App.4th at p. 906.)

The trial court's relevancy concerns are fully supported by the record. The doctor's reliance on the PET scan was likely to confuse a lay jury as to the relevance of

---

[6]     "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*People v. Coddington* (2000) 23 Cal.4th 529, 582-583, fns. omitted.)

his opinion. Consequently, there was no abuse of discretion when the trial court excluded the testimony.

f. *No constitutional error.*

There was no constitutional error in excluding Dr. Kowell's testimony. The application of the ordinary rules of evidence, such as the *Kelly* rule, relevancy and Evidence Code section 352, does not infringe on a defendant's right to present a defense. (*People v. Snow* (2003) 30 Cal.4th 43, 90.) Prior to trial, two psychologists, apart from Dr. Kowell, were appointed to examine appellant with respect to his mental condition in preparation for the trial's guilt phase. Why appellant did not call these experts as witnesses is not disclosed by the record. Appellant had ample opportunity to make a complete statement to the police concerning his mental condition just after the shooting, and he testified at the trial to facts which, if believed, could have persuaded the jury to convict him of the lesser offenses of second degree murder or voluntary manslaughter. Thus, his constitutional rights were not violated by excluding this one bit of potential evidence, which when examined for its logical underpinnings, had no tendency in reason to demonstrate he had a mental disease or defect at the time of the shooting.

2. *The jury instruction.*

Appellant contends the trial court abused its discretion and rendered the trial fundamentally unfair when it failed to give or to modify a jury instruction proposed as a discovery sanction.

a. *Background.*

During opening statements, trial counsel asserted appellant was in love with Shirley, and "they were intimate" and had sex. Trial counsel urged appellant admittedly shot Shirley but for reasons Shirley was intimate with Bob and had gone to a hotel room with Shotgun. The shooting was a crime of passion and thus voluntary manslaughter.

Prior to trial, the trial court held an Evidence Code section 402 hearing to determine whether the statements Shirley made to Mouse concerning appellant constituted inadmissible hearsay.

24

During the trial, after an overnight recess, Mouse reassumed the witness stand to complete her direct testimony.  Soon thereafter, the following colloquy occurred:

"Q.  [The deputy district attorney:]  Now, I want to take you back to the week before [Shirley] died.  [¶]  During your daily conversations with Shirley, did she ever tell you that she had been intimate with the defendant?  [¶]  A.  [Mouse:]  Yes.  [¶]  Q.  What did she say to you about that?  First, let's get the timing down.  [¶]  When did this conversation with her occur . . . ?  . . . [W]hen did this intimacy take place?  [¶] . . . [¶] . . . When did she first tell you and what were the circumstances?  [¶]  A.  Um, I went to her house, like I always did every day, and when we were sitting down she told me -- Do you want me to say the exact words?  [¶]  Q.  Well, let's find out when this was, first.  [¶] A.  Ah, let's see.  It had to be at least one or two weeks before she was killed.  [¶] Q.  What did she say . . . .  [¶] . . . [¶]  Q.  What did she tell you about it?  [¶]  A.  She said, 'Mouse, I f----- up.'  [¶]  And I said, 'Why?'  [¶]  And she goes, 'You know how I'm always drinking on the porch and I talk to [appellant]' -- And I said 'Yes' -- . . . .  [¶] She said, and, um -- she goes, 'I got so drunk that I woke up and I was in the camper.' [¶]  Q.  Meaning his camper?  [¶]  A.  Yes.  [¶]  Q.  Did she tell you if any sex acts occurred?  [¶]  A.  Yes  [¶]  Q.  What did she tell you?  [¶]  A.  I said, 'What did you do?' [¶]  She goes, 'I just gave him a bl-- j--.'  [¶]  Q.  And did she appear to be concerned about what she had done?  [¶]  A.  Yes.  [¶]  Q.  And did she tell you why?  [¶]  A.  She said, 'Mouse, he nagged me and nagged me and nagged me and I just' -- She goes, 'I just was so tired of it.'  [¶]  She goes, 'I guess I just -- 'Being so drunk, I just did it just to get it over, whatever,' something like that."

Trial counsel asked for a sidebar and told the trial court the deputy district attorney had not provided her with discovery of this particular statement.  Trial counsel asked for the testimony to be stricken, for a jury instruction and for the trial court to impose personal sanctions on the deputy district attorney.

The deputy district attorney explained he had inadvertently failed to disclose the statement.  He had believed trial counsel would not object to the testimony as it was

25

appellant's position appellant had had sex with Shirley. And, the information appellant and Shirley had sex assisted the defense. The deputy district attorney said his theory had been appellant had no permission to be inside Shirley's residence, and he had forced his way inside. After trial counsel's opening statement suggesting Shirley and appellant had sex, the deputy district attorney was concerned the jury would imply consent to enter residence from the intimacy. He had been pondering how to meet that evidence.

On the spur of the moment, two to five minutes earlier, he had asked Mouse whether Shirley ever told him she and appellant had sex. Mouse replied, "Yes," and gave him the details. The deputy district attorney had just one more question to ask Mouse: Where did they have sex? He claimed Mouse had claimed Shirley said it had occurred in the camper because Shirley never wanted appellant in her house. The deputy district attorney wanted to elicit this further evidence supporting his theory appellant had forced his way into the house.

Trial counsel argued, "For [the deputy district attorney] to say that a witness's testimony, which is bordering on acquaintance rape, is somehow corroborative of [the defense] case is disingenuous at best."

The trial court commented there had been a discovery violation.

Trial counsel complained Mouse made it sound as if appellant's conduct bordered on "acquaintance rape."

The trial court said in its view, the testimony was at best minimally prejudicial. The testimony merely indicated Shirley got so drunk she did things she later regretted. The trial court told trial counsel it would consider a jury instruction after they had heard all the evidence. Suppression of the statement should be a remedy of last resort.

Trial counsel continued arguing she had not been permitted by the late discovery to secure a hearing on a hearsay objection, which she was now raising. The deputy district attorney again explained he had not acted with bad faith. He argued Mouse's testimony was not hearsay as it was relevant to whether Shirley ever let appellant inside her residence. He wanted to question Mouse on where the intimacy had occurred.

26

The trial court expressed skepticism about the importance of his point. The deputy district attorney asked the trial court if he should just drop any further inquiry.

The trial court then ruled. It struck Mouse's testimony with respect to this one incident of intimacy. It told trial counsel it would consider whether to impose any other sanctions later.

After making its order at the sidebar, the trial court instructed the jury: "The court is going to strike the testimony of the witness pertaining to anything about sex with the victim and the defendant, and . . . the jury is ordered to disregard those statements."

During the discussion on jury instructions, trial counsel proposed the following jury instruction: "During the course of this trial, the [deputy district attorney] . . . intentionally withheld evidence from the testimony from Roxanne Corr[a]lejo [Mouse] and elicited testimony from [her] that was inadmissible and unreliable hearsay in direct violation of a court order. You may consider that concealment and violation in determining the believability or weight to be given to Roxanne Corr[a]lejo's testimony."

The deputy district attorney argued Shirley's statement had been admissible as it was relevant to an issue in the case: even if Shirley had sex with appellant, her statement showed she was not interested in having a relationship with him. He pointed out trial counsel had questioned jurors during voir dire about how some women will tell one friend one thing and say something else to another. So the jury would be aware Mouse might not know the extent of Shirley's sexual activity with appellant. He urged trial counsel had an adequate opportunity to enter an objection to his line of questioning before Mouse testified to the fact of the sexual intimacy, and failed to enter a timely objection. When he questioned Mouse, he was thinking the testimony was only favorable to the defense. In retrospect, he should have made the disclosure. He simply was not thinking clearly as he was in a "rush." The statement did not really hurt the defense case. The testimony had been stricken, and the jury was admonished. He opposed the instruction and argued the instruction also was inappropriately phrased.

Trial counsel claimed the trial court had previously stricken the testimony as it was inadmissible hearsay, and so thus far there was no sanction. She urged the violation was deliberate, and in this case, the bell could not be unrung. Trial counsel requested the jury instruction or a mistrial. She argued the testimony suggested appellant was a "date rapist." She concluded she was entitled to the jury instruction to obviate the damage done by the inadmissible statement.

The trial court refused to give the jury instruction and did not mention modifying the instruction. It ruled the instruction was improperly focused on the credibility of the witness, rather than on the tactics of the prosecution.[7] The trial court found no bad faith by the deputy district attorney. It observed it is evident from all the trial testimony that Shirley was "somewhat promiscuous, whether it was with appellant, Bob, Shotgun and men others than these two." It said, "The fact that [Shirley] was drunk all the time and [appellant] pressured her and she consented is not tantamount to date rape." There was no prejudice as other trial evidence would indicate Shirley had had sex with appellant. Trial counsel had refrained from entering an objection during Mouse's testimony, and raised no objection to the critical question posed by the deputy district attorney, which

---

[7] The pattern instruction for CALJIC No. 2.28 is as follows: "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial. [Concealment of evidence] [and] [or] [[D][d]elay in the disclosure of evidence] may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the [People] [Defendant[s]] [concealed] [and] [or] [failed to timely disclose] the following evidence: [¶] . . . [¶] [If you find that the [concealment] [and] [or] [delayed disclosure] was by the prosecution, and relates to a fact of importance rather than something trivial, and does not relate to subject matter already established by other credible evidence, you may consider that [concealment] [and] [or] [delayed disclosure] in determining the [[believability] [or] [weight] to be given to that particular evidence[.] [[, or] [].]"

could have stopped things midstream.  The remedy of striking Mouse's testimony was sufficient to resolve the discovery violation.  Presumably, the jury would follow the trial court's admonition to disregard the testimony.  The trial court denied the motion for a mistrial, as well.

        b. *The relevant legal principles.*

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of  evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.' " [Citation.]  Evidence subject to disclosure includes . . .' [a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' (*id*., subd. (c)), any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial . . . ' (*id*., subd. (f)) . . . .  'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)'  [Citation.]

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, [contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence,] continuance of the matter, or any other lawful order.'  (§ 1054.5, subd. (b).)  The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' (*Ibid.*)"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.)

We review a trial court's ruling for an abuse of discretion.  (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

c. *The analysis.*

"[A] trial court has broad discretion to fashion a remedy in the event of discovery abuse to ensure that a defendant receives a fair trial. [Citation.] Although a discovery sanction may include an element of punishment, the record must support a finding of significant prejudice or willful conduct. [Citation.]" (*People v. Bowles* (2011) 198 Cal.App.4th 318, 326.) "[T]here is a distinction between having evidence and refusing to disclose, and discovering evidence and disclosing it at a time when it places the other side at a disadvantage." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1759.) Willfulness and the explanation the information was unknown until minutes before the violation are also factors to be taken into consideration by the trial court. (*Ibid.*)

The prosecutor failed in this instance to comply with section 1054.1 by immediately revealing to trial counsel this new statement the deputy district attorney had obtained from Mouse. However, the trial court appears to have concluded the deputy district attorney acted inadvertently in the heat of the trial proceedings. On her part, trial counsel apparently was not listening to the testimony and failed to enter a timely objection. The information disclosed by the testimony was at best minimally prejudicial. As trial counsel had engaged in voir dire on the point, the jury would have been well aware Shirley's claim to Mouse may or may not have disclosed the true extent of Shirley's relationship with appellant. The trial court remedied the discovery violation by striking the testimony in question and admonishing the jury not to consider it. The content of Mouse's testimony was not so inflammatory or so determinative of the issues in the case that the jury would have had difficulty ignoring it.

Striking testimony is regarded as the most severe of sanctions, short of contempt or dismissal and far more devastating to a party than a jury instruction. (See *People v. Edwards* (1993) 17 Cal.App.4th 1248, 1264-1265; § 1054.5, subd. (c) ["court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted."] Mouse's testimony was not inadmissible hearsay. It was not

introduced to prove the truth of its content. It was offered as nonhearsay circumstantial evidence of state of mind from which inferences could be drawn concerning how Shirley felt about the nature of the relationship between her and appellant. It explained Shirley's conduct in rejecting appellant, which in turn was alleged to have provoked appellant to murder. It was relevant to the issue of adequate provocation. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 888; *People v. Oritz* (1995) 38 Cal.App.4th 377, 389-390.) In the circumstances, the trial court's refusal to impose the further sanction of disclosing the deputy district attorney's violation in a jury instruction was reasonable and well within its discretion.

The trial court properly exercised its discretion by refusing to grant the motion for a mistrial on the same grounds. Such a motion should be granted only if a trial court is aware of prejudice that cannot be cured by admonition or instruction. (*People v. Lightsey* (2012) 54 Cal.4th 668, 718.) Any prejudice here was minimal.

Appellant argues the failure to impose a further sanction rendered the trial fundamentally unfair. We disagree. The decision in *Mauricio v. Duckworth* (7th Cir. 1988) 840 F.2d 454 does not assist appellant. We are not addressing compliance with a reciprocal notice-of-alibi statute. And, as a federal case, *Duckworth* is not binding on this court. (*People v. Avena* (1996) 13 Cal.4th 394, 431.) The decision in *Wardius v. Oregon* (1973) 412 U.S. 470 holds only that due process requires reciprocal discovery rights for the parties in a criminal case; it does not assist appellant in demonstrating his trial was fundamentally unfair.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                KLEIN, P. J.

We concur:

        KITCHING, J.

        ALDRICH, J.